Good morning. May it please the Court, Jonathan Strauss on behalf of the appellants of Blue Lake Rancheria, a federally recognized Indian tribe, and Blue Lake Rancheria Economic Development Corporation. I would request to reserve four minutes of my time, please. I caught a little cold on the plane from Chicago, so please bear with me, I'm sorry. There's two issues in this case. Number one, the statutory construction of a particular FUTA exemption under 33067, as well as whether the tribe and its unincorporated division mainstay, which was a temporary staffing and leasing business, were the co-common law employers of these different workers. The court doesn't even have to address the statutory construction of the exemption if it finds that the tribe was, in fact, a co-common law employer of these different workers. And the district court, with all due respect, really didn't address that. They paid lip service to it in one or two sentences, and then completely disregarded that issue. The district court, in looking at whether the tribe and mainstay was a co-common law employer, basically adopted, and in error, a one-prong test for determining whether they were the common law employer. And that test was the right to control and direct the details and means of the different workers' work. The one-prong test that the court uses, in their opinion, was derived by the court from a particular what's called revenue ruling, which was promulgated by the Internal Revenue Service back in 1987. It was revenue ruling 8741. And in that revenue ruling, there was a staffing company, just like mainstay, that prepared a performance evaluation for each of these workers. The staffing company then reviewed the performance evaluation, and based on that review of the performance evaluation prepared by the client, the staffing company then had the right to terminate the employee. There's no discussion in that revenue ruling with respect to who had the right to control the means of the particular employee's work. And the revenue ruling then holds that the staffing company was the common law employer because it retained the right of control to ensure that the services were performed satisfactorily. The court ignored, when it looked at this one-prong test or promulgated it, completely ignored the 20 factors, the 20-factor test in the revenue ruling itself, focused on one prong, the control test. Number two, it ignored the 14-prong test in community for creative nonviolence, which is promulgated by, or which was an opinion of the Ninth Circuit. Completely disregards it. Here, mainstay had more control than the staffing company that the court relied upon in the revenue ruling. Here, the record is perfectly clear, and I'll be happy to, I can finish this up in a few seconds. At ER 111 and 124, mainstay or the tribe had the ultimate control to hire and fire, and it says that at those particular sites, the ultimate control to hire and fire rested with mainstay. The employer handbook that they It's a declaration by the human resources manager. She said in her declaration that she overrode termination decisions as appropriate. This level of control is substantially greater than the staffing company referred to in the revenue ruling that the court so heavily relies on. In addition, there were other elements of control that mainstay had. At ER 66 and 67 and 68, the failure of the employees to follow the staffing company's policies could result in discipline and potential termination. They, they, the staffing company retained control to resolve complaints, harassment claims, and so on and so forth. And last but not least, which is very, very crucial, the court, the district court dismissed it as being hired the supervisors and managers at the client. They were, they were mainstay's employees. So therefore, the supervisors and managers were ultimately determining the control, they had the ultimate control, not the ultimate control, but some of the day-to-day control of the means to which these workers would discharge their, their responsibilities. Did, did the client have the ultimate control, the owner of the small business? Of course they did. But that doesn't mean that mainstay didn't have substantial control. And again, I want to reiterate that this level of control that mainstay had was substantially greater than the employer in this revenue ruling that the court looked at in adopting its one-pronged test. Excuse me. There, there's one other point that I would like to make about the co-common-law-employer discussion for a second. The court, like I said, paid lip service to that, but never really gets into it. You don't have to be the sole common-law-employer of, of, of an employee to satisfy this particular tribal exemption under 33067 of the code. You can be a co-common-law-employer, and there's a lot of cases, and even the restatement section 226, which is cited by us in our briefs, as well as some of the case law that's cited. How, how far does this go? Let's say the client of, of your client, the, the client entity engaged in some sort of improper behavior, either sexual harassment or fired improperly or did something else. Would your client then be responsible as a defendant in that action, and would they be an indispensable party even as a co-employer? They would be, Your Honor. And as a matter of fact, there is information in the record. We have some information in the record, including I think there's some exhibits as well as in the declaration. Our client was a litigant in many, many cases, including sexual discrimination cases, wrongful termination cases, and so on. They are really the ones that have the downside risk with respect to any litigation when there's a potential problem. Now, they may have a contractual right. They would be probably an indispensable party, or they could intervene as a matter of, you know, elect to intervene. But also, they would maybe then have a contractual claim against the client, because there was a contract between the client and the, and my client. So to the extent the ultimate client commits a Title VII violation, my client would have to defend that vis-à-vis the employee, and then The other thing I want to say, though, is that I said, yeah, excuse me. I suggest that you distinguish between my client, the client, and so forth. Let's talk about the parties in other words than just my client. Okay. Let's Mainstay. Mainstay. Okay. I'll try to refer to it as Mainstay, the ultimate client, and then the worker. Okay. I apologize. Thank you. The other thing I was going to say was there is a revenue ruling 66-162, and as the Court knows, and I'm sure Mr. Rothenberg will get up here and say, these administrative pronouncements are subject to some type of Skidmore deference. They're entitled to a measure of respect under Skidmore and Mead, which are Supreme Court cases. That is the seminal co-common law employer administrative pronouncement by the Internal Revenue Service. And what that says, and again, it cites this restatement of agency, Section 226. It's also cited in Foscano, which was a three-party case involving Microsoft. Counsel, I don't want to interrupt the flow of your argument too much, but before you run out of time, I'd appreciate your addressing what, if we happen to disagree with you on whether Mainstay is a co-common law employer, what is the result under the statute? Does the statute require common law employer status? The second prong of our argument, Your Honor, is that it does not. We've laid it out in our brief that the statutory construction, in our opinion, allows for what's called a statutory employer to also take advantage of the exemption. What happened was there was a statutory framework under FUTA added, Congress added a tribal exemption in 2000, many decades after the particular statutory framework was previously promulgated. And we've laid out some case law that stands for the proposition that basically under OTT and its progeny, Congress was presumed to know with respect to the passage of the 2000 Act under President Clinton that statutory employers, especially tribal entities, could take advantage of the exemption. Well, take advantage may be an understatement, because if your reading is correct, then basically anyone can contract with Mainstay or another tribally created entity without having to be anything other than just the paymaster and can avoid the payment of these taxes. And I guess that's my concern with your statutory argument. It's different if you're actually the employer in the ordinary sense of the word. That's obviously what Congress, at least at a minimum, had in mind. But it seems like an enormous loophole and an opportunity for potential abuse. I'm not saying that occurred in this case, but whatever we say the statute means, it's going to mean for other people, too. Right. That's assuming, arguendo, that they don't satisfy the common law employer. Correct. And that was a concern that the district court had, that this would open up the floodgates and the IRS is probably going to address, or the government will address this also. But our response to that is it's unlikely that any tribal state or local government that does not operate a staffing agency would permit a private employer to run its payroll through a government, primarily because of the potential risk we discussed previously, that there's lawsuits and takes a tremendous amount of infrastructure. Except that if you posit that they're not a common law employer, there's no risk of lawsuits or all those other things that would be involved if they were an employer. That's exactly my concern. If you take away the requirement that they be a common law employer and posit that they're not, all they are is the paymaster. A statutory employer. Statutory employer. Right. Well, the other point I was going to make was that the other reason why we don't believe that this would be subject to abuse, the tax savings per employee is $56. It's a wage base of $7,000 times 0.8%. Okay. So for somebody to kind of angle this to create some type of sham in order to save $56 per employee, if there's 100 employees, you're talking about a $5,600 savings. So we don't believe that anybody would be sufficiently incentivized to want to do something like this. I see you're out of time, Mr. Starr. Okay. Thank you. A couple of minutes. May it please the Court. Although there is this. State your name for the record, please. We need your name. Oh, I'm sorry. Gilbert S. Rothenberg, Department of Justice. Thank you, Mr. Rothenberg. Certainly. Although there is, as this Court as it were, considerable complexity in the tax code, we don't think this is such a complexity. The only question here from the statutory interpretation point of view is, as Your Honors have mentioned, whether a statutory employer is entitled to the tribal exemption. And if you look back to the history of the tribal exemption, I'm sorry, the history of the statutory employer, the statutory employer was referred to back in 1942 as the withholding agent. I believe Your Honor referred to as paymaster, and that is essentially what the statutory employer is, the one in charge of the money. When Congress came up with this and says, okay, the withholding agent, you have to pay over the money, even though you're not the common law employer, it did it because it was a, it considered it to be a special class or unusual case. The point of this historical recitation is simply this. Withholding duties are imposed on withholding agents and statutory employers because that's where the money is. But when Congress decided to create a special exemption, not only for government entities but also for tribal entities, it was an exemption of the basic employment relationship. And that's what we're talking about. What is the meaning of employment? And the code in several sections indicates that when we're talking about employment, we refer back to common law employee. So we think there is no merit to the argument that a statutory employer is entitled to the tribal, to the government or the tribal exemption. I had a question about whether they could be considered a co-employer in the common law sense. And in particular, I was interested in whether it matters that mainstay appears, if I read this correctly, to retain a contractual right to override its client's decision to fire someone. So they have a hire and fire opportunity. That is somewhat unusual, it would appear to me. That that would not appear to be a normal employee leasing-type contract. Do you agree that they have that right in this set of contracts? Did you read it this morning? No, I don't believe that. No, I would say that I would not agree to that. The point is if you look at the various, the employee handbook and the various contractual arrangements, the deal was when mainstay came in, every employee had to come in and then they had to sign over the paperwork and they became the technical employee from a statutory point of view of mainstay. But mainstay was very careful to say the hiring and firing, basically it said, you control your own employees. I'm talking about the client agencies. And that's in several places in the, even in the, I'm reading from, it's excerpts of record, page 75. And this is what mainstay says, quote, your day-to-day job duties, hours, and activities will be directed and supervised by management at your work site company. And it talks about mainstay is technically your employer. Okay. Again, that refers to statutory employers. And there are several other places where, again, I'm reading now from excerpts of record, page 114. Customer, this is the ultimate clients. Customer agrees to supervise the work of any mainstay employee assigned to customer's workplace. If you were to ask someone on the street who's working at one of these client agencies, who's your boss? They're not going to say mainstay. They're going to go, whoever is directing that. Well, I don't know what they say. I mean. Well, on page 75, which is where you were, it says, if you're filling out documents of any kind that ask for your employer, you should now list mainstay, not any work site company you're assigned to. So I'm not sure what they would answer. Well, there certainly was a, this issue was litigated. Are they a common law employee or a co-common law employee of the clients? This was a factual determination that the district court decided against mainstay. So my ultimate. Is that a factual question or is it a legal conclusion to be drawn from the undisputed facts? Well, you have about, as my opposing counsel pointed out, there's about 20 factors you look at to see who is the common law employer of a particular individual. And there's any one of 20 factors. They're not all of equal weight. But if you were to say, okay, I want to have a determination now. Is mainstay a co-common law employer? Well, that, to me, that's ultimately a factual determination. Who is your common law employer? And the district court resolved this against mainstay. So you think we review that for clear error? As to who is the common law, I would think so. Now, you would look at the various documentary evidence. But even if it's based solely on documentary evidence, it seems to me who is the common law employer would be ultimately a factual question. The court, the district court, really had little trouble in this regard. Who supplies the insurance for these people? The insurance for the? The health insurance for the employees. I'm not absolutely certain, but I think there was a package. I mean, mainstay was supplying HR services. That was their business model. And they were going to charge besides the, they charged a fee to their ultimate clients. I do not know for a fact the answer to that. But they did supply various HR services. They monitored the, I'm sorry, they administered their health benefit plan. But I don't know, I do not know the exact answer. I guess what I'm thinking of, I mean, you don't claim this is not a legitimate outsourcing business. No, employee leasing businesses exist. And if these people are in the employee of the, of mainstay, can be fired by mainstay, are given their insurance benefits by mainstay, have all the other employee benefits of mainstay, and as long as it's not a sham business, you say it's a legitimate outsourcing operation, why would they not be at least a co-common law employer? The ultimate client, if they wanted to discharge an employee, the main, all main, under the contracts, all mainstay could do is try to place them with another of the various small businesses. So you're saying they're not the exclusive common law employer. Why couldn't they be a co-common law employer? Well, it seems to me that if the ultimate client has the right to say, I don't want X working for me anymore, and mainstay cannot override that, to me. Okay, then they would, but mainstay would then have the right to say, you're not going to work at X, Y, and Z company anymore, we're going to place you at ABC company from now on. They have the right to do that. And they say they do do that. They would try to find another placement for that person. If one client doesn't want this guy anymore, they can place him someplace else. But the, when you compute the feud attacks, if you're working for a number of companies like this, there was some of the cases cited in the briefs, the liability for feuda is not based on one $7,000 that mainstay pays. If you were to place that employee in three different companies during the year, they would have three separate feuda liabilities. So what's the, I don't understand the significance of that, so. The significance is that that's based on employment. So ultimately, the employment, the wage base is based on common law employment. And to me, that would go against mainstay's argument that they were co-common law. You can see that there can be such a thing as a co-common law employer situation, joint employment situation, right? Well, it seems to me, in theory, you could have it. I just, there aren't case laws. Labor law, in other contexts, recognizes joint employment situations, does it not? Well. Under NLRB. It's hard enough being a tax law expert. I'm not a labor law expert. Okay. Well, let's, but it sounds like you're not necessarily, in this case, contesting that as a theoretical possibility. You just say it doesn't happen here. No, I don't believe that was litigated. What was litigated was are they, in fact, a co-common law. Okay, so what I want to ask you about is on Excerpt 93, there's a section of the mainstay handbook called Workplace Monitoring that provides, in part, that workplace monitoring may be conducted by mainstay or the worksite company to ensure quality control, employee safety, security, and customer satisfaction. And it goes on to talk about computer usage and other things. But isn't that a classic right to control performance? Well, I really come back to the bottom line is that presumably these companies are making widgets, and the client says, I don't want X making widgets anymore. He's out of here. That's not my question. That's not my question. This handbook says that mainstay, just like the worksite company, is entitled, has the right to monitor the employee's performance on a day-to-day basis on things like safety and quality control. There is language in these documents that go to, that maybe they could be a common law employer, but there's also language going completely the opposite way. What I quoted to court on page 75, your day-to-day job duties, hours, and activities will be directed by management at your worksite. So there is no magic language. I mean, I don't even understand why that's so significant. That's just like saying that your day-to-day orders will be made by the people in the field, not by the people at headquarters. What's so significant about that? Well, if you look at the various 20 factors, who's supervising you is certainly one aspect of the common law. It's going to be the foreman on the job. It's not going to be the guy in the high office building. I'm not going to be here telling, basically taking the position that there is no instance in which you could have documents like this that could make them the common law employer. What I'm saying is that there is certainly enough evidence both in the management and in some of the declarations to justify, as not clearly erroneous, the district court's holding that these were not the mainstay was not the common law. I have another question for you about your assertion that we review for clear error. This was decided on cross motions for summary judgment. So the district court was making a decision as a matter of law. If there are factual issues that appear to need a trial to resolve them, why wouldn't both parties be wrong and this have to go back for a trial on who's the common law employer? I guess I just have trouble saying that the district court made a finding in this case when it was decided on summary judgment. Well, I may have misspoke on the finding. The point was the district judge looked at all of the facts and say and determined these only go in one direction. Well, I guess what I'm saying is it is not unheard of for us to have a situation in which each party moves for summary judgment and says I'm entitled to judgment as a matter of law and we look at it and say it looks like factual issues to us. So why aren't there factual issues that require further development here to determine how in practice this actually works? Well, from the various declarations and the employee manuals and so forth, it seems to us and it seemed to the district judge that this was essentially an employee leasing company that took care of all the HR issues, because none of these companies had a separate HR staff. So, you know, did you, when they went to clear somebody to hire, they did a security check or whatever you would do. That's what they hired Mainstay to do. They didn't hire Mainstay to help them make widgets. And the district judge was applying a common sense analysis to this set of, I mean, almost none of these facts was disputed. So the district judge was making kind of a common sense analysis of what was this company doing vis-a-vis the clients. And this company was not what I would refer to as a common law employer. The closest analogy I've been able to find in terms of this type of an arrangement was an old revenue ruling that's cited in our brief. I believe it's Revenue Ruling 57. I don't know if I got the number. But it had to do with some demonstrators at Agricultural. And they were, the question was, who was the employer? Was it a state citrus commission or was it some advertising group, presumably agriculture advertising group, who was actually paying them? And the IRS and the Revenue Ruling kind of looked at it and said, ultimately, who is the common law employer? And it was found to be the citrus commission. And because it was the citrus commission, they were entitled to the government exemption. So in terms of where we're going to look for analogies, that's probably the closest one that's cited in any of the materials for any of the parties. Okay. I see your time is up, Mr. Rothenberg. Thank you. Mr. Strauss, back to you. I'm bringing my little cup of water up. Thank you. You asked who paid the health insurance. Main State paid the health insurance. You asked who had the ultimate contractual right to hire and fire. Main State had the contractual right to hire and fire. It's all over the record. I agree with the panel that, to some degree, that there are various serious questions of fact here that cannot be resolved on summary judgment. This case is factually driven with respect to whether or not they're the co-common law employer. Are you saying you don't think the facts justify summary judgment in your favor? I think they actually do, Your Honor. But what I'm saying is, is that the way we ---- I could have sworn you said a second ago. I apologize. I did. I retract that, Your Honor. What I guess I'm saying is that ---- It's your fallback, I'm sure. Exactly. Exactly. We've laid out factually in the entire record that they are the co-common law employer. The government and the district court jumped on the fact that they weren't the sole common law employer. Main State is the co-common law employer. And I'm not even sure how you allocate that. It could be 60-40, 70-30. Even if you're 70-30 and you're the 30, that doesn't mean you're not the co-common law employer. Okay? And in ER-69, if you're terminated, Main State ---- co-common law employers have been recognized. I am not, Your Honor. I think it is a creature of labor and employment law. But it's clearly recognized in the restatement of agency and so on and so forth. The last thing I want to say is under ER-69, if the worker was terminated by the client, Main State attempted to place that worker at a separate location. Okay? So they were the ultimate employer of these different workers. Substance over form, as well as form over substance, these workers were Main State's employees, co-common law employees. Thank you. Thank you. Mr. Rothenberg, thank you, too. The case just argued is submitted. Good morning, gentlemen.
judges: Hug, Silverman, Graber, Cjj